**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARY CHRISTINE TEPPER** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14 C 2848 |
| | ) | |
| v. | ) | |
| | ) | |
| **CAROLYN COLVIN** | ) | Magistrate Judge Daniel G. Martin |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mary Tepper ("Plaintiff" or "Tepper") seeks judicial review of a final decision of Defendant Carolyn Colvin, the Commissioner of Social Security ("Commissioner"). The Commissioner denied Plaintiff's application for disability benefits under Title II of the Social Security Act in a February 19, 2013 written decision of Administrative Law Judge ("ALJ") Angelita Hamilton. Tepper appealed the ruling to this Court and filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision.

### I. Legal Standard

**A. The Social Security Administration Standard**

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit

is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

## B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## C. The ALJ's Decision

Following the five-step analytic process, the ALJ concluded at Step 1 that Tepper had not engaged in substantial gainful activity since her alleged onset date of March 9, 2008. Her severe disorders at Step 2 were degnerative disc disease of the cervical, lumbar, and thoracic spine; status-post 1997 car accident with residuals, asthma, obesity, and depression. The ALJ also assessed the non-severe impairments of hypertension,

anemia, headaches, possible derangement of the right shoulder, and fibromyalgia. None of these impairments met or equaled a listing at Step 3. Before moving to Step 4, the ALJ concluded that Tepper's statements concerning the severity of her symptoms were not credible. She also assessed Plaintiff's residual functional capacity ("RFC") as light work, together with a broad array of exertional and non-exertional limitations. Plaintiff could not perform her past relevant work at Step 4. Based on the testimony of a vocational expert, the ALJ found at Step 5 that jobs existed in significant numbers that Tepper could perform. She therefore concluded that Plaintiff was not disabled.

## II. Discussion

The Court does not review the sparse medical record in detail. The parties and the ALJ have identified and discussed the relevant portions of Tepper's record. In brief, Plaintiff was seriously injured in an automobile accident in 1997. After lengthy rehabilitation she continued to work until she was terminated from her job in 2007. Tepper was living in a barn with a friend on her brother's property at the time of the administrative hearing. She has sought treatment at various times for migraine headaches, lower back pain, uterine fibroids, and pain in other parts of her spine. Various medical providers noted diagnoses of back pain, depression, chronic obstructive pulmonary disorder ("COPD"), fibromyalgia, anxiety disorder, post-traumatic stress syndrome ("PTSD"), migraines, shoulder pain, uterine fibroids, asthma, and degenerative disc disease. Tepper testified at the hearing that she engaged in almost no activities of daily living ("ADLs"), had no friends, and had significant difficulty walking or standing for more than a few minutes. She claimed to need a walker in the winter.

Tepper argues that the ALJ (1) erred at Step 3, (2) incorrectly assessed her

4

credibility, (3) erroneously measured her residual functional capacity RFC, and (4) erred at Step 5.

### A. The Step 3 Issue

ALJ Hamilton found that Tepper's depression did not meet or equal listing 12.04 (affective disorders). Tepper's counsel challenges that finding on grounds that are identical to those he asserted to this Court earlier in *Morgan v. Colvin*, 2015 WL 5116961, at *4 (N.D. Ill. Aug. 28, 2015). The Court rejects counsel's argument here for the same reasons stated in *Morgan.* Listing 12.04 contains factors under both Paragraph A and Paragraph B. ALJ Hamilton explained why Tepper did not satisfy the Paragraph B criteria; she did not address the Paragraph A factors. Tepper claims that was erroneous. When as here Paragraph C is not at issue, a claimant can only meet listing 12.04 if she satisfies *both* the A and B criteria. Since the ALJ found that Tepper did not meet Paragraph B, Tepper's claims concerning Paragraph A are moot. The Court notes that Tepper's counsel has been making the same argument to other courts without success. *See Smith v. Colvin*, 921 F. Supp.2d 890, 900 (N.D. Ill. 2013) (Shadur, J.).

Tepper also argues that the ALJ erred because she failed to undertake the "special technique" analysis required by 20 C.F.R. § 404.1520a. That, too, is frivolous. The special technique analysis assesses the severity of a claimant's functional limitations in ADLs, social functioning, and concentration, persistence, and pace. Contrary to Tepper's claim, the ALJ measured these limitations as part of the Step 3 finding. She concluded that Plaintiff had no restrictions in ADLs, moderate limitations in social functioning, and moderate limitations in concentration. (R. 22). Indeed, Tepper goes on to argue that substantial evidence does not support these assessments, thereby conceding that the ALJ

5

carried out the special technique analysis that she alleges the ALJ failed to address.

That said, the Court agrees in some measure that the ALJ's analysis of Tepper's functional restrictions is troubling. This is especially true as it concerns her ADLs and social functioning, as discussed below. For the purpose of Step 3, however, Tepper can only show that the ALJ erred if Plaintiff affirmatively demonstrates that the record requires a finding that she had at least two "marked" restrictions in her ADLs, social functioning, and concentration. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.04B. The burden for doing so falls squarely on Tepper. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) ("The claimant bears the burden of proving his condition meets or equals a listed impairment."). Tepper does not even allege that she has any "marked" limitations, much less two of them. Nor does she address the Psychiatric Review Technique of Dr. Geroge Grubbs. Dr. Grubbs concluded that Tepper's depression imposed no limitations on her ADLs, created mild restrictions in social functioning, and moderate limitations in concentration. (R. 261). The ALJ assigned "some" weight to this report. Tepper does not challenge that finding. Plaintiff's failure to cite the proper legal standard or the relevant evidence for a Step 3 analysis improperly shifts the onus to the Court to make an argument on her behalf. The Court declines to do so.

Tepper attempts to bolster her argument on this point by claiming that the ALJ failed to give controlling weight to the opinion of treating physician Dr. Hough. She fails to explain how that is relevant to the Step 3 issue. Dr. Hough never said anything about whether Tepper met or equaled listing 12.04. Nor did he issue a report that the ALJ was obligated to weigh; the ALJ correctly noted that "the record does not include any limitations from any of [Plaintiff's] treating providers." (R. 27). Tepper's only claim is that Dr. Hough provided

relevant information about her fibromyalgia. But Plaintiff's Step 3 argument concerns her depression under listing 12.04, not her physical impairments. Insofar as Plaintiff is trying to argue that her fibromyalgia had some impact on her mental functioning, she fails to say what that effect was. No medical treater ever linked the two disorders. It is true that an ALJ is obligated to consider the combined effects of a claimant's impairments at Step 3, including those like fibromyalgia that are not severe. *Alesia v. Astrue*, 789 F. Supp.2d 921, 932 (N.D. Ill. 2011). Tepper, however, does not describe the combined effect of depression and fibromyalgia and does not explain why the ALJ should have reached a different conclusion about listing 12.04. "An ALJ need not specifically articulate why a claimant falls short of a particular listing unless the claimant has presented substantial evidence that she meets or equals the listing." *Id.* For these reasons, Commissioner's motion is granted on the Step 3 issue.

### B. The ALJ's Credibility Assessment

Tepper further challenges the ALJ's conclusion that her allegations concerning the severity of her condition and symptoms were not credible. If an ALJ finds that a medical impairment exists that could be expected to produce a claimant's alleged condition, he must then assess how the individual's symptoms affect his ability to work. SSR 96-7p. The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that he is not credible. Instead, the ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and

7

functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. A court reviews an ALJ's credibility decision with deference because "the ALJ is in the best position to determine the credibility of witnesses." *Craft*, 539 F.3d at 678.

The Court agrees with Plaintiff that ALJ Hamilton's credibility assessment is erroneous. It is also difficult to understand. To illustrate the point the Court cites a relatively minor aspect of the ALJ's decision – asthma. The ALJ found at Step 2 that asthma was a severe impairment. She then rejected the credibility of claimant's testimony concerning all of her symptomology. That necessarily included the symptoms of asthma and COPD. When it came to the RFC, however, the ALJ found that Plaintiff required environmental restrictions on her work capacity *because* of her alleged hearing testimony concerning asthma. (R. 26, citing "hearing testimony"). That constitutes an illogical analysis on two mutually-exclusive grounds: (1) the ALJ could not simultaneously credit and discredit Tepper's testimony on this issue, and even more fundamentally, (2) Tepper never provided the testimony on asthma or COPD that the ALJ said she gave. Oddly, the ALJ recognized the second point in other parts of her decision. (R. 26, "At the hearing, the claimant did not complain of any shortness of breath."). The ALJ seems to have remained unaware that she never asked Plaintiff anything about asthma or COPD, or that Tepper uses two powerful bronchial inhalers daily to control her serious breathing symptoms (Vontolin HFA and Symbicort). (R. 55-56, 274). The result is a serious *non sequitur* in reasoning: (1) the ALJ said that Plaintiff was not credible, (2) then cited (and credited) testimony that Plaintiff never gave, (3) and imposed an environmental restriction based on

allegations that Plaintiff did not make.[1]

More serious issues led the ALJ to other illogical or improper reasons for discounting Plaintiff's credibility. The ALJ noted that Tepper continued to work for several years after her 1997 car wreck. For reasons that are unclear, ALJ Hamilton thought that made Tepper's current allegations less credible. The ALJ appears to have thought that if Tepper could work then, she can work now. That is erroneous on two grounds. First, it misconstrues Plaintiff's allegations. Tepper does not claim that she was disabled during the time period that the ALJ cited. She only alleges that she became disabled as of March 2008, one year after she stopped working at her last job in March 2007. The fact that Plaintiff could work prior to her alleged onset date does not throw any clear light on why Tepper was not credible because she said she could not work after that date.

Second, the ALJ was clearly obligated to discuss her reasoning more fully even if Tepper had worked after the alleged onset date (which she did not). The Seventh Circuit has stated again and again that a claimant's ability to work is not necessarily evidence that the claimant is not disabled or is exaggerating her symptoms. "One can be employed full time without being capable of substantial activity, paradox though that may seem." *Garcia*

---

[1] The ALJ appears to have minimized the seriousness of Plaintiff's pulmonary problems in general by noting that "claimant . . . continues to smoke." (R. 27). The ALJ cited that fact three times in her decision. The implication was clear the Tepper contributed to her own breathing problems. That was erroneous. It is well-established that the addictive nature of smoking makes it "an unreliable basis on which to rest a credibility determination." *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000). Even if smoking exacerbated Plaintiff's breathing problems, the ALJ could not use smoking to discount her credibility without evidence that Tepper would be restored to an ability to work if she followed her doctor's order. *See id.* at 812 (citing 20 C.F.R. § 404.1530(a)); *see also Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985). ALJ Hamilton failed to consider that issue.

*v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013) (citing cases). The circumstances surrounding such employment must be analyzed. *Id.* (noting that a "desperate employee or a lenient or altruistic employer" may be involved). ALJ Hamilton never explained why Tepper was not credible because she worked during a period when she did not even claim to be disabled.

The ALJ was also concerned about Tepper's alleged need for a walker. Plaintiff told ALJ Hamilton that a doctor had prescribed one to help her walk. Tepper said that she only used it "as I need it," particularly "during the winter." The ALJ discounted her credibility by noting that (1) the record did not contain the alleged prescription, and (2) only one medical note in the record showed that Tepper showed up for an appointment with the walker.[2] Strictly construed, both of these claims are true. It is very difficult to understand, however, how the ALJ could have relied on them in light of what she knew about Tepper's medical history. Tepper was very seriously injured in her 1997 automobile accident. Her right ankle was broken. The left foot was severed and had to be re-attached. Her fibula and shoulder were shattered. Tepper was placed in a wheelchair for two years. She did not work for a number of years following the accident. (R. 57-58, 72). Even the ALJ herself found that Tepper's post-1997 symptoms continued to constitute a severe impairment at Step 2.

The grim details of Plaintiff's medical history are fully consistent with her claim that she was prescribed a walker. The severity and length of Plaintiff's injuries should have

---

[2] The Court notes that all of the entries from Tepper's treating physician Dr. Hough were made in months outside of winter. So are most of the notes from the Alexian Brothers Medical Center. Thus the fact that only one doctor stated that Tepper showed up with a walker is not inconsistent with her testimony that she made special use of the walker during the winter months.

10

alerted the ALJ that she needed to inquire into this issue more fully before using it as a basis for attacking Plaintiff. The ALJ could easily have done so merely by asking Tepper who prescribed the walker, when it was prescribed, and why the record only indicated that one medical treater saw her use it. Instead, the ALJ made no inquiry into the matter at all. That is puzzling because the ALJ knew that the record before her was very sparse. Almost none of the post-1997 accident records are present. The ALJ also knew that some of Tepper's treatment had taken place in Florida. The Court recognizes that it was Plaintiff's obligation to give the ALJ a complete copy of her medical records. Nevertheless, the ALJ was fully aware that Tepper had been in a wheelchair for an extended period of time. The Court finds it unreasonable to discount Plaintiff's credibility on the narrow grounds cited by the ALJ without first making some minimal inquiry into the matter.

ALJ Hamilton noted four times in her decision that Tepper did not always seek out consistent medical treatment for her conditions. (R. 24, 25, 26). An ALJ is entitled to consider a claimant's pursuit of treatment and/or his compliance with medical recommendations as part of the credibility analysis. Social Security Ruling 96-7p further instructs ALJs that they must "not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p. ALJ Hamilton did not follow this directive by asking Tepper anything about the issue. That was erroneous. *Craft*, 539 F.3d at 679; *Dominguese v. Massanari*, 172 F. Supp.2d 1087, 1097 (E.D. Wis. 2001) ("This Ruling [SSR 96-7p] requires an ALJ to ask a claimant for an explanation or to search the record for an

11

explanation before drawing an adverse inference as to the severity of the claimant's condition based on medical visits.").

The ALJ's failure to address this issue is additionally problematic because she noted that Tepper lacked health insurance. (R. 25). That should have alerted the ALJ that Tepper might have had special difficulty in getting the medical care she required. The record underscores that point in a manner that the ALJ overlooked. Dr. Hough was concerned at one point about how Tepper would manage to obtain the medical tests that he thought were necessary. (R. 403, "The patient unfortunately does [not] have insurance and I'm not sure will be able to get all of this performed."). The record suggests the tests were eventually carried out. Nevertheless, Dr. Hough's note highlights the potential obstacles that Plaintiff faced in obtaining appropriate medical care. Tepper also told the ALJ at the hearing that she had no money and largely depended on friends to drive her to her doctors' appointments. As Plaintiff said, "I have no livelihood whatsoever." (R. 51). ALJ Hamilton could not discount Plaintiff's credibility without accounting for these facts more carefully.

The problem is made even more troubling because the ALJ thought that Plaintiff suffered from a major depressive condition. A physician at Alexian Brothers also diagnosed her with panic disorder anxiety (which ALJ Hamilton overlooked). (R. 307). Plaintiff has taken at one time or another Xanax, Paxil, and Cymbalta to control her psychological symptoms. The ALJ failed to consider whether Plaintiff's severe mental impairment played any role in what the ALJ thought was insufficient treatment. That was erroneous. The Seventh Circuit has repeatedly instructed ALJs that "mental illness in general . . . may prevent the sufferer from . . . submitting to treatment." *Kangail v. Barnhart*,

454 F.3d 627, 630 (7th Cir. 2006). *See also Barnes v. Colvin*, 80 F. Supp.3d 881, 886 (N.D. Ill. 2015) (citing cases).

The authorities that address this issue frequently concern a claimant's refusal to seek psychiatric treatment. In this case, however, Tepper's physical and psychological states are not easily separated. Tepper made it clear that her mental condition played at least some role in her ability to seek out medical care for her physical ailments. She stated, for example, that she was terrified to drive a car, including transporting herself to doctors' appointments. Tepper's reluctance to drive herself after her serious automobile accident was further exacerbated by the death of her husband two years before the administrative hearing. (R. 72, "That's why I'm afraid to drive and then when my husband got cancer, it was unbelievably horrible for everything."). The ALJ never asked Plaintiff anything about the issue. Nor did she explain in the decision why Plaintiff's statements were not credible in light of the car-related trauma that the ALJ said was still a severe impairment. Clearly, the ALJ was obligated to explain her reasoning on the matter more fully before using it to discount Tepper's credibility.

The ALJ relied heavily on Tepper's ability to carry out ADLs in discounting her credibility. (R. 25, "The claimant's daily activities . . . are inconsistent with her allegations of disabling impairments."). Unfortunately, the ALJ's reasoning on this issue was seriously flawed. Tepper testified as follows: she is unable to move on her own for several hours after arising due to pain; she lives in a barn with one friend who does all the cooking except for an occasional frozen dinner; her friend does the laundry and takes care of her; she has nightmares and wakes up throughout the night from pain; she does not dust; she does not do the dishes; she does no yard work and does not go grocery shopping; she does not

13

drive except under extreme circumstances; she has problems bathing and uses a shower chair. Tepper depends on food stamps and has "had no money for over a year." (R. 51). In short, "I don't do anything." (R. 51).

The ALJ's only discussion of these issues involved citations to what she seems to have thought were contradictions in Tepper's claims. ALJ Hamilton noted, for example, that a doctor's note dated July 2011 states that Tepper took care of her mother. The ALJ seems to have thought if Tepper could do that, then she could work full time. The ALJ had no reason to reach such a conclusion. The note in question merely states that Tepper was a "caretaker for mother." (R. 288). It describes nothing about what this involved. The ALJ had no idea what Tepper did because she never asked her to describe her caretaking activities. Tepper may have provided a significant amount of care; or she may have done very little, and even then only sporadically. Even if Plaintiff exerted herself, courts have been very clear that circumstances may require a claimant to undertake such activities despite his or her serious limitations. Caretaking activities may also require only periodic exertion instead of the full-time demands required for normal work. *See Gentle v. Barnhart*, 430 F.3d 865, 867-68 (7th Cir. 2005). The Seventh Circuit has placed significant stress on the need to differentiate between what a claimant can do at home and what is required to perform in a competitive work setting when an ALJ assesses credibility. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by [ALJs] in social security

disability cases."). ALJ Hamilton did not explore this issue.

She also failed to provide a reasoned explanation of why Tepper was not credible about limitations in using her upper extremities. Plaintiff's treating physician noted serious restrictions in the use of her left arm. He wrote: "The patient was unable to lift the arm past horizontal. She could not adduct the arm without severe pain." (R. 401). ALJ Hamilton quoted that finding. She then dismissed it on the peculiar ground that "claimant raised her left arm at the hearing in order to fix her hair." (R. 26). That does not explain why Tepper was not credible. Among other things, the ALJ did not say how high she raised the arm, did not consider the pain Plaintiff might have experienced in doing so, and did not state why touching one's hair on a single occasion was evidence that Tepper can work full time. The ALJ also criticized Plaintiff on the equally extraordinary ground that "at one point [Tepper] picked up her chair and scooted it over *with herself in it*." (R. 26) (emphasis added). Setting aside the Houdini-like feat of lifting herself up while remaining seated in a chair, this does not address Plaintiff's ability to use her upper limbs on a sustained basis. It does not even claim that Tepper lifted her arms, which was the restriction in question. Common sense suggests that a claimant with serious upper-body limitations may be able to move a chair a few feet on one occasion without being able to work eight hours a day, five days a week. As for her lower extremities, the ALJ cited Dr. Hough for the conclusion that Tepper only had a "slight" limp. That was incorrect. Dr. Hough stated that Tepper had "a mild to moderate limp on the left side." (R. 405).

Finally, the ALJ failed to explain why Plaintiff was not credible concerning her social limitations. Tepper described an almost complete absence of meaningful social activity at the hearing. The ALJ found her unbelievable because consulting psychologist Dr. Jeff

15

Oatley said in his report that "she has friends." (R. 249). But Tepper told the ALJ the same thing: she has one friend with whom she lives and who takes care of her. Plaintiff's point was clearly that she has no other friends and engages in no activities. The ALJ cited nothing in the record that contradicted that statement. She was obligated to explain the basis of her reasoning in greater detail. Plaintiff's motion is granted on the credibility issue.

### C. <u>The Remaining Issues</u>

In light of the ALJ's erroneous credibility assessment, the Court does not address Tepper's remaining claims in detail. Tepper challenges the ALJ's RFC assessment on two grounds. First, she claims that the ALJ failed to provide a function-by-function assessment. That is unavailing. It is well-established that an ALJ is not required to articulate a function-by-function RFC analysis. *See, e.g.*, *Knox v. Astrue*, 327 Fed.Appx. 652, 657 (7th Cir. 2009); *Herrera v. Astrue*, 893 F. Supp.2d 933, 942 (N.D. Ill. 2012). Second, Tepper also claims that the ALJ failed to consider all of her severe and non-severe impairments, including disc protrusions, shoulder pain, fibromyalgia, and PTSD. The problem with this argument that is Tepper makes no effort to explain what additional restrictions the ALJ would have imposed had she considered these impairments. The burden for doing so falls on Tepper, not the Commissioner.

That said, the ALJ's errors related to credibility will require her to reconsider the RFC if the ALJ finds on remand that Plaintiff was more credible than she thought. That is especially true as it concern's Tepper's ADLs and social functioning. For example, the ALJ thought that some restrictions needed to be imposed on Plaintiff's personal interactions because Plaintiff allegedly testified that she was "somewhat isolative at times." (R. 27). Tepper actually stated that she was almost completely isolated and had no contact with

people.

Given the need for further discussion, the ALJ is directed to clarify her reasoning on other issues related to the RRC. The confused analysis of the environmental limits stemming from asthma was noted earlier. As part of that finding, the ALJ cited two medical records, neither of which mentions environmental restrictions. It is entirely unclear why the ALJ construed the record to mean that environmental factors, rather than exertional issues, triggered Plaintiff's shortness of breath. No medical expert appeared at the hearing to testify on that or any other medical issue.

The ALJ also failed to draw a logical bridge between some of the RFC findings and the record. She gave significant weight to the state-agency physician Dr. Thomas Peele. Dr. Peele said that Plaintiff could occasionally climb stairs, ramps, ladders, ropes, and scaffolds. (R. 291). The ALJ thought that Plaintiff was more restricted than that. She concluded that Tepper could never climb ladders, ropes, or scaffolds, though she could occasionally climb ramps and stairs. (R. 23). The ALJ provided no reason for her conclusion. She was certainly entitled to find that Tepper was more restricted than Dr. Peele thought Tepper was. Without citing her reasons, however, it is unclear why the ALJ assessed these specific limitations instead of others. Why could Tepper climb ramps and stairs but not ladders or scaffolds? The ALJ never said. A more careful analysis might have shown that Tepper was even more restricted than the ALJ said.

The ALJ tried to support the RFC with a chiropractor's note stating that Tepper had a normal gait. (R. 27). Yet the ALJ herself plainly thought that Tepper did not have a normal gait. She said, for example, that "hazard limitations" were necessary in the RFC because Tepper had an "inverted left foot that causes a slight limp." (R. 26). As noted

earlier, even that acknowledgment of Tepper's gait overlooked that Dr. Hough said she had a "mild to moderate limp." (R. 405). Obviously, Tepper could not have both a normal gait and an abnormal gait at the same time. "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations.). SSR 96-8p. The ALJ shall address the reasons for all of her RFC findings more clearly on remand, and explain how the record supports the exertional and non-exertional limitations.

## III. Conclusion

Plaintiff Mary Tepper's Motion for Summary Judgment [12] is granted in part. The Commissioner's cross-motion [20] is granted in part and denied in part. The Commissioner's decision is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

ENTER:

*Daniel G. Martin*
Daniel G. Martin
United States Magistrate Judge

DATE: November 20, 2015.